302.    Now, to the issue of specific harms suffered by the Plaintiff, as citizen, for Count I through Count X: these Defendant members of Congress have refused to assist, ensure, and make ready the calm, easy, reasonable and safe—both for Plaintiff and a worried Congress and its employees; in the light of recent threats against members of Congress, necessitating even more carefully controlled access by the public to congressional offices within the Complex—legally protected access by Plaintiff to their offices in the Complex. That's access *which they must legally extend and support*, as Plaintiff's rights of access *to them*, *in the Complex*, are protected and guaranteed by the First Amendment, for Plaintiff's exercise of religion, speech, press, assembly, and petition, individually and in the 26 combinations thereof. Those First Amendment rights of Plaintiff are further protected under the Fourth, Fifth, and Fourteenth Amendments to the Constitution.

303.    Plaintiff has sought congressional access, in writing, from the Defendants, as he provided advanced notice to the members of Congress making possible any-and-all advance notice and coordination between members of Congress and the Capitol Police (if they deem that necessary), for an "ordinary, run-of-the-mill," unscheduled office "drop in" by a citizen to their receptionist's office on "official business" (if-or-as the Capitol Police wish to call it). Plaintiff has not hidden his identity; will come with a Driver's License, photo I.D. Plaintiff's mailing address has been available to members of Congress via his correspondence to them; for some senator Defendants, contact began with a February 14, 2023, letter to their state offices. In a July 2024 letter to Defendants, Plaintiff acknowledged the likely changes coming to Capitol Hill—in the wake of the July 2024 assassination attempt on presidential candidate Donald John Trump, in Butler, Pennsylvania—for increased security for the Complex. That message and the intent of those letters to members of Congress, to the Capitol Police chief and its Board: *work with me, answer me, let me know in advance the specific parameters of what will occur—and won't, if you say so, supported in law—for my personal visits to the Complex*. The Plaintiff and his reasonable demands for access have never been "a" problem,

"the" problem, or an undue and unreasonable security concern for members of Congress, the Capitol Police, or its Board. Yet no Defendant member of Congress, no member of the Board nor its chief of police ever answered—*any correspondence*.

304.     Beginning March 2021, Plaintiff was forced to set aside full time attention to his book manuscript; in fact, Plaintiff was forced to work on everything else with no time for the book because this scandal must "break" first, as members of Congress and president(s) answer—before any book sales are possible. As previously stated: "The author's difficult challenge was to find a way to promote the book, get the media to break the story, *or* find a way to force either president or Congress to answer in court." By March of 2021, Plaintiff concluded that there was no reasonable way to promote his book (for this hidden scandal); there wasn't any way to interest dishonest and corrupt media in this story, a media which has always been a part of hiding this scandal. One avenue remained for the author, non-lawyer, lacking the financial wherewithal to hire competent, First Amendment legal counsel for what would be a protracted and difficult quest to secure his rights of access to Capitol Hill in court, so that he might finally go confront the accused at their most prominent place of business: Plaintiff had to do it all. On his own! *Go sue 'em!*

305.     To repeat and summarize that paragraph: a first-time book author was force to set aside a decade's worth of work and, on his own, from scratch, with no legal assistance, find a path to force his way into the congressional offices in the Complex through federal courts. And if that was not enough, do this without compensation, without any help or guidance, legal or otherwise, nor any reasonable assurance that this course of action by Plaintiff might, eventually, lead to this slight, opening victory: that this Plaintiff, book author, now angry citizen and crusading citizen-journalist-activist might get his day on Capitol Hill—to see if that dramatic, official (as much as it would be) "service," by a citizen, by a citizen-journalist, by a citizen-petitioner, would prove to be "the" break point. Plaintiff has suffered, and continues to suffer, extreme physical and emotional stress, and

a mounting toil on his weary body. This project has become all-consuming for the Plaintiff; this project is at his side and on his mind every waking hour of every day—for he has found that nothing less will suffice to find the way and see it through, to speak these truths to those in power . . . who have shockingly refused all of his written correspondence of the last-two years. A crisis—perhaps the greatest financial scandal in the 237 year history of the republic, certainly the greatest constitutional crisis, as two conspiring branches of government have worked to hide their wrongdoing—which they have known about and refused to face, which has forced the most demanding and dedicated commitment from one citizen to see them answer to the nation for this mess they made. This man, this Plaintiff.

306.    Plaintiff is a citizen. Plaintiff is also a citizen-journalist, which is to say an ordinary citizen claiming that an ordinary citizen may have, hold, and exercise a First Amendment press right and demand that right, in equal measure of the other four rights, of religion, speech, assembly, and petition; that this citizen press right be respected, honored, and accommodated by public official *when requested* by citizen-claimants; when requested by Plaintiff. Plaintiff has sought, by repeated written requests to Defendant members of Congress, to have his First Amendment rights honored so he might pay a simple, unscheduled visit. Only one Defendant member of Congress ever answered.

307.    Plaintiff has suffered great emotional, physical, and mental stress—*every day*—for his life has been "on hold," his book has been "on hold" as his quest, as citizen-journalist, has been impossible to advance because there has been no safe and certain ability for Plaintiff to visit congressional offices on Capitol Hill during the ordinary business day for Congress, as those office buildings are, so the *Capitol Police* proclaim: "open to the public," at least for "official business," as *they say* but do not explain. *But that's not true*, for not a single member of Congress would replied with written approval other than one member, with a signature and nothing more. The rising sun every day mocks this citizen's quest to go to Washington and confront those whom he would accuse.

308.     Plaintiff is a citizen. But Plaintiff is also a professional citizen-journalist, though, perhaps, as this crisis unfolds, the nation will conclude that there are no journalists who can or should ever be trusted again. This citizen, as *professional pressman*, has been denied recognized standing and an official credential as a professional reporter to receive the free-and-easy access into and throughout the Complex as accorded to members of the Congressional Press Galleries, the "official," restrictive press guild whose members enjoy an exulted status and access throughout the United States Capitol Hill Complex (as professional journalists who have a constitutionally-protected right to be there, as they would proclaim, as Congress has acknowledged and made smooth their way *since they are not reporting on the true nature of the "broken" Public Debt limit*). Plaintiff, by written request to the Defendant congressional officers so empowered, asked for an accommodation, a credential, the pressman's official congressional Photo ID press-badge-on-a-lanyard. Silence; not one, official reply. More unending stress for Plaintiff, another dead end, as Plaintiff has sought to advance his reporting and prepare for the prominent, national debut, launch, of his professional career (as the pressman who broke this story which none of the credentialed media, with all of their easy, daily access to the member of Congress—ever did). Plaintiff's chance to break this story before the nation—*impossible, without access*. Denied, by their silence, because they could, because these Defendant members of Congress are part of and players in hiding these first-ten counts, these violations of law, from the nation, from citizens, from citizen-electors, and citizen-taxpayers. A nation at the edge of bankruptcy and the only pressman pushing that story and seeking to confront members of Congress, as a pressman wearing that formal badge: can't get in the buildings!

309.     As a result of the combination of these actions and inactions by Defendants, Plaintiff has suffered great harm, including emotional distress, physical stress, an inability to fully report on Congress, the inability to earn a living, and the inability to resume editing his 800-page manuscript. Plaintiff has lost five years of earnings, along with concurrent ability to contribute to retirement and

health savings accounts, going back to January 2020, because members and leaders of Congress have refused to address the "broken" Public Debt limit, have refused every request by Plaintiff for the most basic access to their receptionist's office in the exercise of his First Amendment rights. Had Congress and these Defendants acted on the "broken" Public Debt limit, and/or acceded to Plaintiff's request for access into and throughout the Complex, that would have set the stage for the ultimate and most complete telling of the story of the spending-and-debt games of Congress—by this professional pressman, by this first-time author.

310.     Plaintiff's life, his life's work (whichever book comes first book is but the start), *The Durbin Report* (which would have been his first book, the culmination of a ten-year-long effort to report on the spending-and-debt games of Congress, put on hold 47 months ago, March 2021), his reputation, and his heartfelt attempts to save the nation he loves, all stuck in an agonizing state of suspended animation because one honest effort after another has been met by the stony silence of no reply while the cauldron of the toxic Debt of the nation continued its volcanic rise towards an awful tectonic event which is coming any day now. It's the worst feeling in the world to see a nation-altering disaster coming, do your best to push, prod, shame, warn and scare—those whom we had thought were the best from among us, our elected legislators and presidents: to do something. Immediately. Behind closed doors. Make the tough decisions necessary then begin the painful public acts. So that this mess is not forced to be first answered for by investors in financial markets here and abroad. I did what I could while they did not. Let history judge all of us. As I have suffered along the way!

### Count XI: Violations of John Paul Durbin's Constitutional Rights of Free Exercise of Religion as guaranteed by the First Amendment

311.     All foregoing Paragraphs are incorporated as if fully set forth herein.

312.     Article I Defendants have denied Plaintiff's repeated written requests to honor his First Amendment rights, including the Free Exercise of Religion, to visit their individual offices within the

Complex. That denial had a concurrent, chilling effect, denying Plaintiff the Free Exercise of Religion, by itself, and in the fifteen possible combinations with his other-four First Amendment rights of speech, press, assembly, and petition. Plaintiff, as a person of faith, has been denied an opportunity to speak to members of Congress or their staff, verbally and/or in writing. Plaintiff, as a person of faith, coming from and with that perspective, *as religious pressman*, has been denied an opportunity to report and interact with members of Congress and their staff on issues he's concerned about. Plaintiff, as a religious citizen, has been denied the opportunity to petition individual members of Congress for a redress of grievances, *delivered in person* to their offices in the Complex during the hours when those building are "open to the public."

313.     Plaintiff has written to these Defendant members requesting that they clarify, confirm, and make ready his legal and constitutionally-protected access to their receptionist's offices in the Complex. Advanced, written approval has been and remains an absolutely necessity for Plaintiff. Plaintiff lives in Ohio. Any visit to the nation's capital requires advance planning, a scheduling commitment of several days, a 500 mile journey by car with at least one overnight stay, with the concurrent costs of gasoline, food, parking, and tolls, not to mention the human cost of the stress and strain upon body and soul. Not a task for the faint of heart nor one to be lightly undertaken.

314.     Plaintiff was once denied entrance into the Complex, Wednesday, October 27, 2021. All of those points, the costs and the human toil, raised in the preceding paragraph, were paid in full by the Plaintiff on that trip. Never again, Plaintiff said, without a formal, written understanding for Plaintiff's access. While that 2021 instance occurred during Covid-19 restrictions, Plaintiff suspects that there exist unconstitutional and illegal, non-public, non-disclosed rules of the Board, its chief of police, and its entire police force, "acting on behalf of individual members of Congress," attempting to control— *and interfere with*—the constitutionally protected access by citizens, by this Plaintiff, to their congressional offices. The Capitol Police barely and vaguely address issues of citizen access on its

public web pages, declaring that citizens on "official business" are free to drop off letters, as they also state that the seven congressional office buildings in the Complex are "open to the public" during normal business hours.

315.    Accordingly, Plaintiff has sought, asked, and repeatedly requested by his written correspondence to Defendant members of Congress, their preapproval for his free-and-easy easy access —as is routinely accorded by these members of Congress to their home-state constituents. Plaintiff has made these requests directly these Defendant members of Congress. Alas, Plaintiff is an Ohioan. That means that Plaintiff is not a constituent—in the formal sense, a citizen-voter residing in the congressional district—of 434 members of the House of Representatives nor 98 senators. Doesn't matter, Plaintiff asserts his First Amendment rights include access to all 435 representatives and all 100 senators. The Fourteenth Amendment's equal protection clause can, should, does, and must apply to every citizen for their reasonable and ordinary access to any member of Congress, at the Complex, as is formally, informally, and easily accommodated every day by Defendant members of Congress to their home-state voters, *constituents*, and citizens. Further, these written requests to members of Congress, by the reasonable and ordinary nature of the access requested, a simple "drop in, unscheduled visit," do not present an undue burden upon members of Congress, their staff, to the Capitol Police, or anyone else in any formal positions in the Complex. Yet every request has been met with stony silence.

316.    Defendant members of Congress, by their refusal to respond to the written requests, have denied Plaintiff's First Amendment rights to the Free Exercise of his Religion in the Complex. That right, by itself, and in the 15 possible combinations with speech, press, assembly, and petition.

317.    Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff the safety, security, and peace of mind which would eliminate any-and-all worries for his person, papers (in whatever amount he deems necessary to bring for his visits to multiple offices), and effects when he comes to the Complex to visit their receptionist's office.

Defendants' refusal to respond equals a denial of those rights and is an illegal form of prior restraint of these right which are protected by the Fourth Amendment to the Constitution.

318.     Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff's liberty and property rights for his visit to their receptionist's office. Defendants' refusal to respond equals a denial of those rights and is an illegal form of prior restraint of these right which are protected by the Fifth Amendment to the Constitution. No response by Defendant members of Congress equals a denial of the due process rights of Plaintiff, as Defendants must respond to the specifics of his request, to confirm, to deny, to attempt to find some common grounds of agreement between the parties for Plaintiff to visit their receptionist's office.

319.     Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff the equal protection of his constitutional rights, of his First Amendment rights, his Fourth Amendment rights, and his Fifth Amendment rights. Plaintiff asserts these rights are his and apply for his access to any member of Congress. Plaintiff asserts that these rights must be accommodated, at a minimum, in equal measure for access routinely granted on a daily basis by Defendant members of Congress to their "home-state constituents," if not at an even higher, strict constitutional standard for his access and for his full and free exercise of these rights. Defendants' refusal to respond has denied Plaintiff equal protection and is an illegal form of prior restraint.

320.     Defendant members of Congress, individually, in their official capacity as constitutional officers, *bear an individual responsibility* to this Plaintiff (or any citizen) to honor his constitutional rights for the Free Exercise of Religion, Freedom of Speech, the Press Right of an individual citizen, the Freedom to Assemble within the Complex, and the Right to Petition Government For a Redress of Grievances. Defendant members of Congress, individually, in their official capacity as constitutional officers, *bear an individual responsibility* to this Plaintiff to honor his Fourth Amendment rights for a visit by Plaintiff to their receptionist's office. Defendant members of Congress, individually, in their

official capacity as constitutional officers, *bear an individual responsibility*, under the due process clause of the Fifth Amendment, to respond to the written request by Plaintiff and to answer for the call by Plaintiff for his constitutional rights to be honored by individual, Defendant member of Congress. Defendant members of Congress, individually, in their official capacity as constitutional officers, *bear an individual responsibility*, under the equal protection clause of the Fourteenth Amendment, to respond to the written request by Plaintiff and to answer for the call by Plaintiff for his constitutional rights to be honored by the individual, Defendant member of Congress, with equal protection of the rights of Plaintiff as any other citizen, and for the equal protection of each First Amendment right, individually, and in every one of the 26 combinations thereof and a concurrent, equal protection of his Fourth Amendment right and his Fifth Amendment right.

321.     Defendant members of Congress, individually, in their official capacity as constitutional officers, *bear an individual responsibility* for the constitutionally protected access by Plaintiff to and in their receptionist's office, *a nonpublic forum* (in a public building) where the constitutional rights of Plaintiff may not be subject to *any* arbitrary restrictions, diminution, degradation, or exclusions: because a Defendant member of Congress opposes Plaintiff's views, including, by their silence, their disapproval for the stated purpose and manner of the visit by Plaintiff, as disclosed in Plaintiff's letter of request. Plaintiff's rights have been denied by each Defendant member of Congress. Plaintiff has sought to add his quiet and reasonable voice to the democratic process of the nation's great deliberative, legislative body, in a calm and quiet manner of speech and documents presented to their offices within the Complex which would not disrupt or detract from an otherwise ordinary day in the receptionist's office of a member of Congress, including these Defendant members of Congress.

322.     John Paul Durbin has no adequate remedies at law, has suffered, is suffering, and will continue to suffer serious and irreparable harm to his constitutional rights, to his rights of advocacy as citizen, and to his citizen press rights to cover the greatest constitutional crisis in the history of the

nation, the greatest financial scandal of our lifetimes, unless Defendant members of Congress are enjoined from their continued violations of law.

323. John Paul Durbin is entitled to declaratory relief for these violations, along with temporary, preliminary, and permanent injunctive relief.

324. John Paul Durbin is entitled to nominal, compensatory, and punitive damages.

### Count XII: Violation of John Paul Durbin's Constitutional Rights of Freedom of Speech as guaranteed by the First Amendment

325. All foregoing Paragraphs are incorporated as if fully set forth herein.

326. Article I Defendants have denied Plaintiff's repeated requests to honor his First Amendment rights, including the Freedom of Speech, to visit their individual offices within the Complex. That denial had a concurrent, chilling effect, denying Plaintiff the Freedom of Speech in the fifteen possible combinations with his First Amendment rights of religion, press, assembly, and petition. Plaintiff, as an ordinary citizen, has been denied an opportunity to speak to members of Congress or their staff, in person, verbally and/or in writing. Plaintiff, as a pressman, has been denied an opportunity to report and interact with members of Congress and their staff on issues he's concerned about. Plaintiff's speech has been denied, to petition individual members of Congress for a redress of grievances, delivered in person to their offices in the Complex during the hours when those building are "open to the public."

327. Defendant members of Congress, by their refusal to respond to the written requests have denied Plaintiff's First Amendment right to the Freedom of Speech in the Complex. That right, by itself, and in the 15 possible combinations with religion, press, assembly, and petition. A denial of these rights, by illegal prior restraint.

328. Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff's Fourth Amendment rights.

329.    Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff's Fifth Amendment rights.

330.    Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff the equal protection of his constitutional rights, under the Fourteenth Amendment.

331.    Defendant members of Congress, individually, in their official capacity as constitutional officers, *bear an individual responsibility* to this Plaintiff to honor his constitutional rights of Freedom of Speech.

332.    Defendant members of Congress, individually, in their official capacity as constitutional officers, *bear an individual responsibility* for the constitutionally protected access by Plaintiff to and in their receptionist's office, *a nonpublic forum*, where the constitutional rights of Plaintiff may not be subject to any arbitrary restrictions, diminution, degradation, or exclusions: because the Defendant member of Congress opposes Plaintiff's views, including, by their silence, their disapproval for the stated purpose and manner of the visit by Plaintiff, as disclosed in Plaintiff's letter of request.

333.    John Paul Durbin has no adequate remedies at law, has suffered, is suffering, and will continue to suffer serious and irreparable harm to his constitutional rights, to his rights of advocacy as citizen, and to his press rights to cover the greatest constitutional crisis in the history of the nation, the greatest financial scandal of our lifetimes, unless Defendant members of Congress are enjoined from their continued violations.

334.    John Paul Durbin is entitled to declaratory relief for these violations, along with temporary, preliminary, and permanent injunctive relief.

335.    John Paul Durbin is entitled to nominal, compensatory, and punitive damages.

### Count XIII: Violation of John Paul Durbin's Constitutional Rights of Freedom of Press as guaranteed by the First Amendment

336.    All foregoing Paragraphs are incorporated as if fully set forth herein.

337.    Article I Defendants have denied Plaintiff's repeated requests to honor his First Amendment rights, including his citizen's Press Freedom right, to visit their individual offices within the Complex in furtherance of his reporting which is 179° opposite the stories pedaled by the 1,300 credentialed members of the Congressional Press Galleries who have worked hand-in-hand with their buddies in Congress to conceal the story of the "broken" Public Debt limit from the nation and unwary bondholders. The denial of Plaintiff's First Amendment, citizen Press right has had a concurrent, chilling effect, denying Plaintiff his Press Freedom in the fifteen possible combinations with his First Amendment rights of religion, speech, assembly, and petition. Plaintiff has been unable to fully report on Congress, advocate for change, and present his reporting in-person, demanding that the "broken" Public Debt limit finally be answered for in a lengthy public process before the nation.

338.    Defendant members of Congress, by their refusal to respond to the written requests have denied Plaintiff's First Amendment right of Press Freedom in the Complex. That right, by itself, and in the 15 possible combinations with religion, speech, assembly, and petition. A denial of these rights, by illegal prior restraint.

339.    Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff's Fourth Amendment rights.

340.    Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff's Fifth Amendment rights.

341.    Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff the equal protection of his constitutional rights, under the Fourteenth Amendment.

342.     Defendant members of Congress, individually, in their official capacity as constitutional officers, *bear an individual responsibility* to this Plaintiff to honor his constitutional rights of Freedom of the Press.

343.     Defendant members of Congress, individually, in their official capacity as constitutional officers, *bear an individual responsibility* for the constitutionally protected access by Plaintiff to and in their receptionist's office, *a nonpublic forum*, where the constitutional rights of Plaintiff may not be subject to any arbitrary restrictions, diminution, degradation, or exclusions: because the Defendant member of Congress opposes Plaintiff's views, including, by their silence, their disapproval for the stated purpose and manner of the visit by Plaintiff, as disclosed in Plaintiff's letter of request.

344.     John Paul Durbin has no adequate remedies at law, has suffered, is suffering, and will continue to suffer serious and irreparable harm to his constitutional rights, to his rights of advocacy as citizen, and to his press rights to cover the greatest constitutional crisis in the history of the nation, the greatest financial scandal of our lifetimes, unless Defendant members of Congress are enjoined from their continued violations.

345.     John Paul Durbin is entitled to declaratory relief for these violations, along with temporary, preliminary, and permanent injunctive relief.

346.     John Paul Durbin is entitled to nominal, compensatory, and punitive damages.

### Count XIV: Violation of John Paul Durbin's Constitutional Rights of Freedom of Assembly as guaranteed by the First Amendment

347.     All foregoing Paragraphs are incorporated as if fully set forth herein.

348.     Article I Defendants have denied Plaintiff's repeated requests to honor his First Amendment rights, including Freedom of Assembly, to visit their individual offices within the Complex. That denial had a concurrent, chilling effect, denying Plaintiff's Freedom of Assembly in

the fifteen possible combinations with his First Amendment rights of religion, speech, press, and petition—not one of which can be used, enjoyed, exercised, or attempted within the Complex without this "master key." Plaintiff has been unable to fully share his religious views, report on Congress, advocate for change, and present, in-person, his written demand that the "broken" Public Debt limit finally be answered for by these Defendant members of Congress before the nation.

349.   Defendant members of Congress, by their refusal to respond to the written requests have denied Plaintiff's First Amendment right of Assembly in the Complex. That right, by itself, and in the 15 possible combinations with religion, speech, press, and petition. A denial of these rights, by illegal prior restraint.

350.   Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff's Fourth Amendment rights.

351.   Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff's Fifth Amendment rights.

352.   Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff the equal protection of his constitutional rights, under the Fourteenth Amendment.

353.   Defendant members of Congress, individually, in their official capacity as constitutional officers, *bear an individual responsibility* to this Plaintiff to honor his constitutional rights of Freedom of Assembly, in the Complex and in their receptionist's office.

354.   Defendant members of Congress, individually, in their official capacity as constitutional officers, *bear an individual responsibility* for the constitutionally protected access by Plaintiff to and in their receptionist's office, *a nonpublic forum*, where the constitutional rights of Plaintiff may not be subject to any arbitrary restrictions, diminution, degradation, or exclusions: because the Defendant member of Congress opposes Plaintiff's views, including, by their silence,

their disapproval for the stated purpose and manner of the visit by Plaintiff, as disclosed in Plaintiff's letter of request.

355.     John Paul Durbin has no adequate remedies at law, has suffered, is suffering, and will continue to suffer serious and irreparable harm to his constitutional rights, to his rights of advocacy as citizen, and to his press rights to cover the greatest constitutional crisis in the history of the nation, the greatest financial scandal of our lifetimes, unless Defendant members of Congress are enjoined from their continued violations.

356.     John Paul Durbin is entitled to declaratory relief for these violations, along with temporary, preliminary, and permanent injunctive relief.

357.     John Paul Durbin is entitled to nominal, compensatory, and punitive damages.

### Count XV: Violation of John Paul Durbin's Constitutional Right To Petition the Government For a Redress of Grievances

358.     All foregoing Paragraphs are incorporated as if fully set forth herein.

359.     Article I Defendants have denied Plaintiff's repeated requests to honor his First Amendment rights, including right to Petition the Government For a Redress of Grievances, to present that document—not only once, but as many times as Plaintiff deems necessary—directly to their individual offices within the Complex. That denial has had a concurrent, chilling effect, denying Plaintiff's right to Petition Government For a Redress of Grievances, in the fifteen possible combinations of his other First Amendment rights, of religion, speech, press, and assembly. Plaintiff has been unable to petition Congress, in that document, advocate for specific changes, and present his demand for an American version of a *Truth and Reconciliation Commission*.

360.     Defendant members of Congress, by their refusal to respond to the written requests have denied Plaintiff's First Amendment right of Petition in the Complex. That right, by itself, and in the 15 possible combinations with religion, speech, press, and assembly. A denial of these rights, by

illegal prior restraint.

361. Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff's Fourth Amendment rights.

362. Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff's Fifth Amendment rights.

363. Defendant members of Congress, by their refusal to respond to the written requests by Plaintiff, have denied Plaintiff the equal protection of his constitutional rights, under the Fourteenth Amendment.

364. Defendant members of Congress, individually, in their official capacity as constitutional officers, *bear an individual responsibility* to this Plaintiff to honor his constitutional rights to Petition the Government For a Redress of Grievances, in the Complex and in their receptionist's office.

365. Defendant members of Congress, individually, in their official capacity as constitutional officers, *bear an individual responsibility* for the constitutionally protected access by Plaintiff to and in their receptionist's office, *a nonpublic forum*, where the constitutional rights of Plaintiff may not be subject to any arbitrary restrictions, diminution, degradation, or exclusions: because the Defendant member of Congress opposes Plaintiff's views, including, by their silence, their disapproval for the stated purpose and manner of the visit by Plaintiff, as disclosed in Plaintiff's letter of request.

366. John Paul Durbin has no adequate remedies at law, has suffered, is suffering, and will continue to suffer serious and irreparable harm to his constitutional rights, to his rights of advocacy as citizen, and to his press rights to cover the greatest constitutional crisis in the history of the nation, the greatest financial scandal of our lifetimes, and to petition for a redress of grievances unless Defendant members of Congress are enjoined from their continued violations.

— 110 —

367.     John Paul Durbin is entitled to declaratory relief for these violations, along with temporary, preliminary, and permanent injunctive relief.

368.     John Paul Durbin is entitled to nominal, compensatory, and punitive damages.

### Count XVI: Violation of John Paul Durbin's Constitutional Right of Press Freedom, by Refusing to Grant a Formal Press Credential and Standing

369.     All foregoing Paragraphs are incorporated as if fully set forth herein.

370.     Defendants Johnson, Klobuchar, Fischer, and past and current members of the Senate Rules and Administration Committee have denied Plaintiff's written request to honor his First Amendment press rights by granting him a credential and standing as a professional journalist. These Defendants are the congressional officers so empowered, under the rules of the House and Senate, to serve as the final adjudicating authority for press credentials. Plaintiff has been unable to fully report on Congress, lacking this credential and standing. Plaintiff has been unable to plan a trip to Capitol Hill, uncertain about his entrance into and transit throughout the Complex during "normal business hours," when the seven congressional offices buildings are, *so they say*, "open to the public." Not only has Plaintiff been unable to advance his reporting—his-style, his-way, including an aggressive and disrespectful written badgering of the members of Congress—Plaintiff has suffered, is suffering, and will continue to suffer irreparable harm. One irreparable harm coming in weeks . . . *when this scandal breaks* . . . the once-in-a-lifetime opportunity to be on the scene, on Capitol Hill, as the pushy, aggressive, outside reporter WHO BROKE THE STORY, who sued in federal court to be granted press access to Capitol Hill . . . won't be there, credentialed, familiar with the lay of the land, aggressively reporting: because Congress pretends that it has completely met its constitutional requirements allowing for press coverage (with the attendant ease of access for "certain," "certified" press professionals) with its comfy-cozy arrangement with the restrictive press guild which has "filled" all of the constitutionally-protected "professional press rights" reporting slots *necessary* for

a nation which wants to know what's really going on in Congress. With spending. With Debt. Wait, what: a "broken" Public Debt limit. The restrictive press guild—with the full, formal, and legal consent of the duly authorized congressional officers for press accreditation—have, by its rules of admission, made sure that all of the credentialed press on Capitol Hill looks like themselves; they want no outside competition (which might report the stories they refuse to cover; an outside competitor who would report *on them* and their existing, comfortable arrangement with Congress, suggesting *maybe that's why* the full details of the "broken" Public Debt limit have never appeared in any media coverage by any of the 1,300 members of the restrictive guild).

371.    Defendants Johnson, Klobuchar, Fischer, and past and current members of the Senate Rules and Administration Committee denied Plaintiff's request that they honor, on behalf of the entire Congress, as they are so empowered to do, his First Amendment press rights, including the right to visit the offices of all of the members of Congress in furtherance of his reporting. The denial of Plaintiff's First Amendment, citizen-professional press right has had a concurrent, chilling effect, denying Plaintiff his professional Press Freedom in the fifteen possible combinations with the rest of his First Amendment rights—which are still there, still his, part and parcel of any professional pressman who so chooses to, concurrently or at any time, claim these rights—of religion, speech, assembly, and petition. Plaintiff has been unable to fully report on Congress, advocate for change, which any professional pressman may do (though the restrictive guild does not allow that for its members, as is its choice and right), and present his reporting in-person to the offices of members of Congress, including in that reporting the pressman's demand that the "broken" Public Debt limit finally be answered for in a lengthy public process before the nation. Plaintiff declares that there is *a constitutional right for "advocacy reporting"* which is still reporting, but, in the view of Plaintiff, can, should, and, for this Plaintiff, must include the use of aggressive and muscular language, at times including ugly, contentious, and contemptuous words—all in service of Plaintiff's reporting, his

reporting style, and the whole point of journalism: tell the truth, report the full story, but also tell news consumers what *you*, the professional pressman, think and, since you're already *there*, what we —*as citizens can do*—could do, should do, and must: to make this monster of an out-of-control government *answerable to and a servant of* the people. If journalism isn't doing that then what good is it? It's this worthless, dishonest and corrupt, credentialed Congressional Press Galleries, 1,300 strong, who have only been entertaining the nation with *their stories* of the games playing on Capitol Hill but never telling the truth, the whole truth, besides that tiny part of the story which *they say:* is *the news*.

372.     Defendants Johnson, Klobuchar, Fischer, and past and current members of the Senate Rules and Administration Committee, by their refusal to respond to the written request of application by Plaintiff, have illegally denied Plaintiff's First Amendment press right, and, by their silence, their non-response to Plaintiff's letter of application, have exercised illegal prior restraint on his reporting.

373.     Defendants Johnson, Klobuchar, Fischer, and past and current members of the Senate Rules and Administration Committee, by their refusal to respond to the application by Plaintiff, have denied Plaintiff's Fourth Amendment rights, to be secure is his person, papers, and effects for his visits to the Complex to drop in to the receptionist's offices of all of the members of Congress. A refusal to respond is the same as a denial, which is an illegal, prior restraint.

374.     Defendants Johnson, Klobuchar, Fischer, and past and current members of the Senate Rules and Administration Committee, by their refusal to respond to the written request by Plaintiff, have denied Plaintiff's Fifth Amendment rights of due process. (i) Defendant officers must acknowledge his serious, professional application; (ii) acknowledge that their existing, comfortable arrangement with the restrictive press guild, with its rules of admission which these congressional officers have approved, clearly excludes this applicant (those rules are why Plaintiff has applied directly to these congressional officers) from any chance of acceptance by that restrictive guild (which this crusading, First Amendment professional pressman-advocate has no wish to join, nor

sees the need to; clearly, its rules exclude this professional pressman, his style and circumstances, his advocacy and, most importantly, his willingness to sue Congress and its members, which the restrictive guild does not permit its members to do); (iii) due process rights, in this case, clearly must mean that—in the absence of any existing body, authority, practice, or so designated person, officer or office to consider and adjudicate an application by a "non-traditional, professional pressman," to be granted "the" "professional press credential" to cover Congress—these Defendant congressional officers must, *themselves*, review and rule *on this application*, per the rules of the House and Senate, as no other authority exists empowering any other officer(s) for this task; (iv) due process rights require that these Defendant officers disclose the basis they will use to evaluate this application; the schedule and extent for any additional information needed from the applicant, and the length of time from application to decision by these designated officers; (v) due process requires an ability for a temporary, "trial" credentialing available, with the burden of proof for any denial falling upon these Defendant officers should they choose that heavy-handed, onerous, unkind, and illegal prior restraint of an applicant's constitutionally protected First Amendment professional press right to cover Congress; (vi) it cannot matter, it does not, that this is a "first of its kind" case of a non-traditional, professional pressman seeking accommodation by Congress, by these so designated officers, for a professional credential *granted directly by them*; equal protection means there must be a First Amendment right for an unaffiliated, non-traditional press professional to have and enjoy access throughout the Complex as the existing rules, comforts, and accommodations granted by Congress— by its members, by the board and its police force—are extended to reporter-members of the restrictive guild, the Congressional Press Galleries. (vii) By their silence, these Defendant congressional officers have refused to do their job, have refused to go on the record responding Plaintiff's application, have refused to answer for each of these points and render, as they must, a decision to Plaintiff, answering to and for the Constitution, its First Amendment, and his application

as they stand in for the entire Congress. (viii) They have not done their job and they've gotten away with that which has and continues to be a denial of Plaintiff's due process rights. (ix) Their silence has been, is, and will remain an illegal prior restraint as they have said nothing and done nothing.

375.     Defendants Johnson, Klobuchar, Fischer, and past and current members of the Senate Rules and Administration Committee, by refusing to respond to the written request by Plaintiff, have denied Plaintiff's Fourteenth Amendment rights of equal protection. (i) Defendant officers have denied equal protection for this professional pressman's application and consideration which they are required to do, which they currently extend and is available to any applicant to the restrictive press guild (for admission into that comfortable club), which includes an ultimate appeal, if denied by the restrictive guild, to these Defendant officers. (ii) Defendant officers have denied equal protection, as they cannot have an application by a non-traditional pressman, this Plaintiff, considered by the restrictive press guild, the Congressional Press Galleries, as the non-traditional pressman is a competitor who does not meet its rules and whose reporting needs, style, editorial tone, and litigious circumstances, past and present, are at such a great variance with the rules of the restrictive press guild; Plaintiff acknowledges he has not applied to the restrictive guild nor have these Defendant officers required that he do so (a necessary contextual framing here, as these Defendant officers have not written one word to Plaintiff in response to his written application); (iii) these arguments are presented as a preemptive response and a framing of the issues should Defendant officers and their Counsel suggest that *application to* the restrictive guild "should have been" a necessary first step for the Plaintiff; these equal protection arguments answer those points. (iv) Under equal protection, these Defendant officers *cannot* use the criteria of the restrictive press guild (which it uses for admission, under its rules, for its applicants), in whole or in part, either to evaluate and/or later deny Plaintiff's application, as Plaintiff is a non-traditional, professional pressman whose place of residence, reporting style, requirements, and a willingness/need to sue

— 115 —

members of Congress are at such a great variance from the rules-for-members of the restrictive guild. (v) Since, under the need for equal protection, these Defendant officers *have no rules in place for the consideration of non-traditional, professional pressmen*, that fact already amounts to a denial of equal protection to any such applicant; these Defendant officers *have refused to recognize their dilemma, their constitutional failing* (having no process in place), and move to immediately remedy that in light of application by Plaintiff. (vi) By their silence, their inaction by Plaintiff's application, these Defendant congressional officers have denied Plaintiff the equal protection for the free-and-easy access into and throughout the Complex as currently enjoyed by the members of the restrictive press guild, including a comfortable, well-established acceptance by the Capitol Police for the presence and actions of members of the journalist's club (Congressional Press Galleries), including their entrance into the Complex, transit throughout, and their unaccosted presence in all of the buildings in the Complex, at all permissible times, including being in the receptionist's offices of individual members of Congress, the hallways and corridors, tunnels, elevators, lobbies, and any other parts of the buildings of the Complex as they routinely conduct themselves, scurrying about "reporting" on Congress. (vii) By their silence, these Defendant congressional officers have denied Plaintiff the equal protection of this professional pressman's concurrent, living, breathing, and applicable other-four First Amendment rights: of religion, speech, assembly, and petition, as Plaintiff is entitled to use and enjoy as he goes about reporting on Congress. (viii) By their silence—which is prior restraint—these Defendant officers have had a chilling effect of freezing out Plaintiff, as professional pressman, from being in the Complex, reporting, traveling about, bringing his professional pressman's documents, as spartan or as voluminous as he deems necessary.

376.     John Paul Durbin has no adequate remedies at law, has suffered, is suffering, and will continue to suffer serious and irreparable harm to his constitutional rights, to his rights of advocacy as citizen and as a professional pressman, including his press rights to cover the greatest constitutional

crisis in the history of the nation, the greatest financial scandal of our lifetimes, unless the Defendant members of Congress, as designated officers for press accreditation, are enjoined from their continued violations of Plaintiff's First, Fourth, Fifth, and Fourteenth constitutional rights.

377.     John Paul Durbin is entitled to declaratory relief for these violations, along with temporary, preliminary, and permanent injunctive relief.

378.     John Paul Durbin is entitled to nominal, compensatory, and punitive damages.

### Count XVII:: Violations of John Paul Durbin's First, Fourth, Fifth and Fourteenth Amendment rights by the Capitol Police Board

379.     All foregoing Paragraphs are incorporated as if fully set forth herein.

380.     The Capitol Hill Office Complex, in Washington, federal District of Columbia, is the seat of the nation's legislature, the Congress of the United States of America. It is the principal place of business for Congress where 435 representatives and 100 senators regularly meet to consider the business of the nation. By its physical location, Capitol Hill, in Washington, D.C., is distant from much of the nation, requiring a major commitment in time and money for any citizen wishing to fully exercise their First Amendment rights to speak to and lobby members of Congress and speak to their Capitol Hill staff at their principle place of business and action.

381.     The Complex is wholly under the control of the Article I branch of Government. Congress has sole control over the Complex, through its leaders, members, staff, its own police force, the United States Capitol Police, which under the administration of the Board (whose four officers are appointed by and answer to Congress, especially leaders). All issues of citizen access into and throughout the Complex, including conditions of citizens access for exercising their constitutional rights into and throughout the Complex reside wholly within the unitary control of Congress.

382.     The final authority for "general, public access" by citizens into and throughout the Complex rests with the Board. The web pages for the House and Senate Sergeants at Arms provides

no publicly available details for their role and policies regarding citizen access into and throughout the Complex.[12] [13] The website for the Architect of the Capitol, under "Explore the Capitol Campus," lists four choices: (1) Accessibility Services; (2) Prohibited Items; (3) Tours and Events; (4) Official Business.[14] The "Official Business" link leaves the Architect of the Capitol website, sending the inquiring citizen to a web page of the Capitol Police.[15]

383.　　The web page for the Capitol Police, "Official Business," *vaguely states*: "Those with official business at the U.S. Capitol, whether to attend a Congressional hearing or meeting, or wishing to drop off a letter, should review the following information for awareness and ease of general access." There is no explanation of the term, "Official Business." There is no explanation for "who" decides "what" constitutes "Official Business." There is no explanation for whether "unofficial business" is permissible and where that authority resides. There is no explanation for "how" one "applies," to "whom," for what kind of "approval" for "Official Business" into and throughout the Complex. There is no explanation for whether citizens "wishing to drop off a letter" "requires" an "appointment" for that act, thereby facilitating their "casual and ordinary" "public access" to the Capitol Hill office(s) for any one or multiple members of Congress. There is no explanation anywhere, suggesting that citizens ability to visit individual congressional offices is limited to one United States representative, for where a citizen claims residence, and two United States senators for a citizen's state of residence, or the complete opposite, where citizens can freely visit as many congressional offices as they choose, in the full exercise of the constitutional rights, including those five rights of the First Amendment. On the face of these "sparse statements," the United States Capitol Police department, acting on behalf of the Board, has no "official policies" nor offers any public guidance for citizens wishing to fully exercise some-or-all of their five, First

---

12. House: https://www.house.gov/the-house-explained/officers-and-organizations/sergeant-at-arms (01/29/2025)
13. Senate: https://www.senate.gov/about/officers-staff/sergeant-at-arms.htm (accessed 01/29, 2025)
14. Architect of the Capitol: https://www.aoc.gov/explore-capitol-campus/visitor-resources (01/29/2025)
15. Capitol Police: https://www.uscp.gov/visiting-capitol-hill/official-business (01/29/2025)

Amendment rights: of religion, speech, press, assembly, and petition—other than the specific act of dropping off a letter.

384.    The inquiring citizen, choosing the link of the Capitol Police, under "Official Business," for "Building Access & Hours," gets more specifics.[16] "The U.S. Capitol (presumed to mean the Capitol Building, but that is not clearly stated) is open to the public Monday – Saturday from 8:30 a.m. – 4:30 p.m. Visitors with official business appointments may enter the U.S. Capitol Visitor Center beginning at 7:15 a.m." There is no further explanation clarifying whether these words mean that "all citizens" with "Official Business" "must" only enter the Complex through the U.S. Capitol Visitor Center, for the Capitol Police use the ambiguous word, "may," "enter the U.S. Capitol Visitor Center—." This web page of the Capitol Police isn't clear whether there is any distinction between citizen access to the U.S. Capitol Building and its Visitor Center, versus different rules of access for the seven Congressional Office Buildings.

385.    In *Durbin v. Pelosi*, John Paul Durbin sued the four highest ranking members of Congress: House Speaker Nancy Pelosi, Senate Majority Leader Chuck Schumer, Senate Minority Leader Mitch McConnell, and House Minority Leader Kevin McCarthy, along with three Defendants, then-House Sergeant at Arms, William J. Walker, then-Senate Sergeant at Arms Karen H. Gibson, then-as-now Chief of the Capitol Police, J. Thomas Manger. That suit was over access into the Complex so that John Paul Durbin could present his formal Petition For Redress directly to members of Congress, one receptionist office at a time. Rather than go into the details of that suit in Washington, District of Columbia, 1:22-cv-03222, Plaintiff will point to the most pertinent facts which bear upon the circumstances, details, claims, and prayer for relief in *Durbin v. Biden*.

386.    (i) John Paul Durbin was seeking the assistance of the Court to ensure his "easy and ordinary access" into the Complex so that he might deliver his petition for redress, in person, to the

_____

16. https://www.uscp.gov/visiting-capitol-hill/official-business/official-business-building-access-hours

receptionist's offices of members of Congress. (ii) The Court dismissed the case, *unironically*, on September 11, 2023, which did not resolve any of the issues of John Paul Durbin for getting any formal, written assurances for his unfettered access into the building of the Complex during normal business hours when those buildings are "open to the public." (iii) During the course of *Durbin v. Pelosi* being before that Court, neither the Defendants nor Counsel offered one sentence of assurance for the specifics of the access request by John Paul Durbin, to include being able to go to as many offices as Citizen Durbin wished. (iv) Even with this matter before that Court, John Paul Durbin wrote an April 5, 2023, letter to congressional leaders, both sergeants at arms and the chief of the Capitol Police requesting written assurances for the parameters of his access into and throughout the Complex; these USPS Certified Mail correspondence did not garner a single reply, though perhaps that's because John Paul Durbin was aggressively and obnoxiously pounding out this reporting themes, including reminding leaders about the "broken" Public Debt limit.

387.     Fast forward to July 2024. The same issues remain for the Plaintiff. The same issues remain unanswered. Plaintiff writes to the Board, July 11, 2024, in a USPS Certified Letter to: then-as-now House Sergeant at Arms, William McFarland, the-now-replaced Senate Sergeant at Arms, Karen Gibson, the then-as-now Chief of the Capitol Police, J. Thomas Manger, and the then-as-now Architect of the Capitol, Thomas E. Austin; those four are the entire roster of members of the Board. The plaintiff's greatest fears, fully expressed in a letter to the Board: You refuse to confirm the conditions of my access; the Board refuses to clarify any of the spare public statements online of the Capitol Police; the Plaintiff will travel from Ohio, at great time and expense, including the strain and uncertainties with no clear understanding of his entrance into and transit throughout the Complex. Worst of all, Plaintiff has the greatest unease as though he's being "set up," either to be refused entrance, or only able to visit a few offices (who knows how few or how many). Or, the worst-of-the-worst: the Capitol Police intend to create an incident (as we all wonder of the events of January 6,

2021, at the Capitol Building, and the role of the Capitol Police, FBI, and "planted agitators among the crowd" for how that day played out) which they will use to force citizen John Paul Durbin to never present himself at the Complex or face charges for the event and circumstances which they intentionally set up; Plaintiff is greatly pained to have to put these thoughts to the page, sounding like a kook or a conspiracy nut. Plaintiff is concerned for his safety, as, at the same time, he wishes to fully allay any concerns on the part of the Capitol Police (regarding him; what he seeks to do, and the specific circumstances thereof). What are the exact details of Plaintiff's constitutional rights to come to Capitol Hill? *Put it in writing*! *Answer the questions*!! *The Board refused*!!! Plaintiff has suffered great stress, strain, anguish—which continues unabated; his entire life's work hangs in the balance, but these four faithless public servants *don't give a rat's ass*. So here we are, in federal court.

388.     In the July 11, 2024, letter to the Board, Plaintiff requested:

(a) I will be coming to the Capitol Hill Office Complex during normal business hours. (b) I will visit as many offices as I want—on "Official Business," dropping off letters. (c) I will not have appointments with any member of Congress or staffers. I will not require anyone's permission to come and go as I please—am I correct? (d) The Capitol Police, the Sergeants at Arms, will ensure I enjoy a liberal allowance for the number of document pages I may bring. It can be a three-page letter, to six offices; a five-page letter to 175 offices. It's possible that, eventually, I'll go to all 535 offices, leaving some as-yet-unknown number of pages, perhaps in an orderly manner from one building to the next, or skipping around over the course of several days. (e) I will document my visits to congressional offices and transit throughout Capitol Hill by video recording, wearing a body camera (no prohibition noted in any rules). (f) Only under the most extraordinary circumstances will members, staffers, or Capitol police question me for my presence in and transit through Capitol Hill, including my visits to congressional offices. No chaperone will be needed or allowed.

389.     John Paul Durbin is entitled to nominal and compensatory damages.

390.     John Paul Durbin is entitled to punitive damages from these Defendants for their actions, inactions, and their silence. There is not enough money in Washington to ever compensate Plaintiff for the irreparable harm, stress and stain caused by these four public officials, Defendants.

**Harm and Distress suffered by John Paul Durbin as a direct
result of Violations of Law, Counts XI through XVII**

391.    All foregoing Paragraphs are incorporated as if fully set forth herein.

392.    For each count, XI through XVI, Defendants, individually and jointly, knowingly

violated the Constitution and federal laws. Defendants violated Plaintiff's First Amendment rights:

Count XI: Freedom of Religion; Count XII: Freedom of Speech; Count XIII: Citizen Press Rights;

Count XIV: Right of Assembly; Count XV: Right to Petition Government For a Redress of

Grievances; Count XVI: First Amendment Press Right of a Professional Pressman; Count XVII:

Violation of Plaintiff's rights by the Capitol Police Board. Concurrent with each and every violation

of these First Amendment rights, Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights have

been and are being violated.

393.    Plaintiff John Paul Durbin has sought to peacefully assemble within the Complex

during "normal business hours" when those buildings "are open to the public." Plaintiff has sought

this access so that he might advance and enjoy his First Amendment rights: of the free exercise of his

religion, engage in what he deems necessary speech, including the in-person transmission of his

correspondence and documents to the receptionist's offices for some-if-not-all of the members of

Congress. As citizen-journalist, Plaintiff sought this constitutionally protected access to the offices of

members of Congress within the Complex to further his reporting. And, at the same time, as

a citizen, and citizen-journalist-activist, push the members of Congress to answer for their fiscal

crimes with an extensive, specific, orderly public process—which the Plaintiff, as citizen-petitioner,

has been unable to formally and safely (for himself and them) present, directly and in-person to the

members of Congress at their individual offices on Capitol Hill (in-person delivery is absolutely

essential to Plaintiff in light of something like 250 pieces of USPS Certified Mail to members of

Congress, some, at least twice, from February 2023 through July 2024, which garnered a single reply,

a member's signature and nothing more; why would Plaintiff reasonably assume any of those letters were ever seen since none-but-one were acknowledged). In light of the thirteen-years-plus dishonesty and deceit by Congress, the institution, and all of its members, the only possible, sufficient, and reasonable process to come must be one that's televised live before the nation, an American *Truth and Reconciliation Commission*. The only way such an event *might begin*—and have any chance at legitimacy, let alone believability and trust by the American people—will be for a neutral, outside person to present such an important and specific proposal. I am that man and my proposal comes from my 14 years of dedicated work, not only trying to understand and report on what was done, but propose the answers needed to reinvent, publicize, and make honest—the annual appropriation process in Congress, utilizing existing law, which Congress never follows, *with a few tweaks added*.

394.    Plaintiff, as citizen, as citizen-journalist, is advocating for the restoration of honest, transparent, orderly, calm, deliberative, and accountable: public government, financially sound and sustainable and answering directly to the American people without any media standing in the way. The Plaintiff-as-citizen seeks to help save his nation from financial ruin, as the citizen-journalist-activist seeks the public process necessary, as the conspiracy of silence ends, so that by his advocacy, through his reporting, aided by his dogged pursuit by-all-means-necessary of his First Amendment rights, this story will finally be put before the nation with Plaintiff's reporting front-and-center as the only pressman truth-teller in the nation. And then Plaintiff, at long last, will be able to earn the financial rewards in the marketplace for his fifteen years of work for which he has yet to earn a dime.

395.    Plaintiff has sought and illegally been denied his right of assembly into and throughout the complex. From his pointed, muscular correspondence to the Defendant members of Congress, and Defendant officers, Plaintiff is known by Congress, its leaders, officers, and members, as a forceful voice, as the only citizen, only reporter in the nation challenging them: for their part in the illegal borrowings by Treasury from a "broken" Public Debt limit, damaged far beyond legality;

a Public Debt limit "broken" once by Congress, then ten dishonest, illegal, and ineffective Debt laws it authored and passed over the last thirteen years; the finances of the nation, perhaps ruined forever, as Congress has failed to provide the necessary oversight which it is legally required to do.

396.     Plaintiff has sought and illegally been denied his right of petition, a document he would personally deliver to members of Congress. A petition laying out his case against Congress, including over seventy events, transgressions, and failures by the Congress which the Plaintiff calls Articles of Impeachment. Truly, these legislative and financial crimes against the nation easily meet the standard of "high crimes and misdemeanors." While Plaintiff is not a special prosecutor nor an independent counsel, Plaintiff, as citizen, as citizen-journalist, as citizen-journalist-activist, has sought to directly challenge the Congress, its leaders and members, so that "this long train of abuses and usurpations" may end and may finally be answered for, by Congress, before the nation. A petition which proposes the only possible path forward for the consideration of these matters, calling upon citizens to sit in judgment of their Congress and president and of the misdeeds by all.

397.     All of the Plaintiff's reporting, research, analysis, commentaries, and proposals have been stuck, held in abeyance, unable to advance on the public stage because these Defendants have refused Plaintiff's requests that his constitutional rights be honored in Washington, at *their* Complex.

398.     These First Amendment rights are personal to each individual, each citizen, but especially personal to this Plaintiff, to his passions and to this cause. Plaintiff's voice, speech, reporting, analysis, proposals—are intertwined with his being, his nature, his reasons for life itself; deny this man his voice and you have taken his life. The greatest personal journey, actions, tasks attempted, and body of work for this Plaintiff, this man: *this American project* to speak truth to power which has been forced Plaintiff's to demand that each and every one and of his constitutional rights be honored—by Congress, as written in the First Amendment by its opening words: "Congress shall make no law—", better paraphrased as: Congress shall not! The 119th Congress and those past, these

Defendants, have refused Plaintiff's requests, pleadings, and appeals.

399.    By the denial of Plaintiff's First, Fourth, Fifth, and Fourteenth Amendment rights, Plaintiff has and continues to suffer great emotional distress and has been unable to earn of living reporting on a dysfunctional federal government, its spending-and-debt games and its illegal acts including the ongoing conspiracy between the Article I and Article II branches. Plaintiff's reporting will never be heard, listened to, or be believed while everyone in the executive branch, everyone in the Congress, all of the political and financial press, and every individual and enterprise in the world of finance remains committed to hiding the crimes of Congress and presidents for fear of the great financial, economic, political, social, and national security costs likely coming *when* these crimes are exposed and put before the nation, as the nation then demands that the finances of the nation be put right and that these guilty pay for their crimes.

400.    Absent actions by this Court, Plaintiff will continue to suffer serious and irreparable harm to his constitutional rights, continuing emotional distress, and the continuing inability to earn a living without the vindication of his First Amendment rights, further protected by the Fourth, Fifth, and Fourteenth Amendments and federal law.

401.    Plaintiff John Paul Durbin seeks declaratory relief, along with temporary, preliminary, and permanent injunctive relief, to prevent the Government from its continuing infringement upon Plaintiff's constitutional and statutory rights.

402.    Plaintiff John Paul Durbin is entitled to nominal, compensatory, and punitive damages.

## PRAYER FOR RELIEF

Plaintiff respectfully requests this Honorable Court grant the following relief:

(1)    Declaratory relief that the Public Debt limit of the United States is $14.294 trillion, as stated in 31 U.S.C. § 3101(b);

(2)    Declaratory relief that the Public Debt limit of the United States is $14.294 trillion,

as set in law on February 12, 2010, and that has been the legal limit, unchanged since that date, stated in 31 U.S.C. § 3101(b);

(3)    Declaratory relief that the allowance for $2.1 trillion in additional Public Debt, in 31 U.S.C. §§ 3101A(a)(1), 3101A(a)(2)(i), set the maximum amount of outstanding United States Treasury Debt at $16.394 trillion; that allowance, for those three, stepped increases, was a one time event without approval for the reissuance of that Debt upon its maturity;

(4)    Declaratory relief that the allowance for $2.1 trillion in additional Public Debt, as stated in 31 U.S.C. §§ 3101A(a)(1), 3101A(a)(2)(i), applies only to Debt issued by Treasury in response to those letters required in the law, from president to Congress, after August 1, 2011, through December 31, 2012, still outstanding, as originally issued;

(5)    Declaratory relief that the allowance for $2.1 trillion in additional Public Debt, in 31 U.S.C. §§ 3101A(a)(1), 3101A(a)(2)(i), was at war with itself; Pub. L. 112-25 did not legally raise the Public Debt limit of $14.294 trillion, in 31 U.S.C. § 3101(b); the language in the law "the limit on debt provided in section 3101(b) (referred to in this section as the "debt limit") is increased by $400,000,000,000" was and is null and void; since the Public Debt limit was not raised by 31 U.S.C. §§ 3101A(a)(1), 3101A(a)(2)(i), Treasury's subsequent borrowings of $400 billion, $500 billion, and $1.2 trillion in Pub. L. 112-25 were not and are not legal, are not enforceable;

(6)    Declaratory relief that the current level of the Public Debt managed by the United States Treasury—updated daily, at Treasury's web page "Debt to the Penny"—is in violation of 31 U.S.C. § 3101(b);[17]

(7)    Declaratory relief that the current level of the Public Debt managed by the United States Treasury—updated daily, at Treasury's web page "Debt to the Penny"—is in violation of

---

17. https://fiscaldata.treasury.gov/datasets/debt-to-the-penny/debt-to-the-penny. It is the height of irony and speaks to the troubling and discordant nature of this case that Plaintiff has filed suit against two Treasury secretaries and the Commissioner of the Bureau of the Fiscal Service, at the same time Plaintiff has a relatively high degree of faith that the continual, daily statement by Treasury for the total of outstanding Debt of the nation is—most likely: correct.

31 U.S.C. §§ 3101(b), 3101A(a)(1), and 3101A(a)(2)(i);

(8)     Declaratory relief that the current level of indebtedness managed by the United States Treasury is in violation of the Fourteenth Amendment to the Constitution;

(9)     Declaratory relief that eight "suspensions" of the Public Debt limit, in Pub. L. 113-3, 113-46, 113-83, 114-74, 115-56, 115-123, 116-37, and 118-5 were and remain unconstitutional, illegal, void, and carry no force of law;

(10)    Declaratory relief that two stated dollar additions to the Public Debt limit, Pub. L. 117-50 and 117-73 were and remain unconstitutional, illegal, void and of no effect;

(11)    Declaratory relief that all ongoing Debt financial transactions by Treasury—including the sale of Bills, Bonds, and Notes, all interest payments, all principal payments, and any reissuance or sale of Debt—are subject to the limitation in 31 U.S.C. § 3101; because of the discrepancy between 31 U.S.C. § 3101 and Treasury's currently reported outstanding Public Debt—all Treasury Debt transactions are in violation of the Constitution and statutory law;

(12)    Declaratory relief that past and current reporting by the Office of Management and Budget, including any-and-all information, statements, characterizations, tables, and reports for the status of the Public Debt of the nation, including its limitation (in statute or otherwise), has been false, were and are in violation of the Constitution and statutory reporting requirements;

(13)    Declaratory relief that past and current reporting by the Bureau of Fiscal Service, U.S. Department of the Treasury, including any-and-all information, statements, characterizations, tables, and reports for the status of the Public Debt of the nation, including its limitation (in statute or otherwise), has been false, were and are in violation of the Constitution and statutory reporting requirements;

(14)    Declaratory relief that past and current reporting by the Congressional Budget Office, including any-and-all information, statements, characterizations, tables, and reports for the

status of the Public Debt of the nation, including its limitation (in statute or otherwise), has been false, were and are in violation of the Constitution and statutory reporting requirements;

(15)    Declaratory relief that past and current reporting by the Congressional Research Service, including any-and-all information, statements, characterizations, tables, and reports for the status of the Public Debt of the nation, including its limitation (in statute or otherwise), has been false, were and are in violation of the Constitution and statutory reporting requirements;

(16)    A temporary restraining order, preliminary, and permanent injunctive relief enjoining Defendants from the sale, *redemption,* or *reissuance* of *any of the Public Debt* by Treasury, of Bills, Bonds, and Notes, as long as the total outstanding debt of the nation, as reported by Treasury's "Debt to the Penny" daily report is in violation of 31 U.S.C. § 3101 (unfortunately, this presupposes that dollar amounts presented online at "Debt to the Penny" are an honest accounting for the total amounts of outstanding Public Debt, and will remain so);

(17)    A temporary restraining order, preliminary, and permanent injunctive relief enjoining Defendants from the sale, *redemption*, or *reissuance* of *any of the Public Debt* by Treasury, of Bills, Bonds, and Notes, until Defendants present to the Court a plan to bring Treasury into compliance with 31 U.S.C. § 3101;

(18)    A temporary restraining order, preliminary, and permanent injunctive relief enjoining Defendants from all payments of principal and interest on Treasury Bills, Bonds, and Notes until Treasury is in compliance with 31 U.S.C. § 3101;

(19)    Plaintiff respectfully requests that this Court enter an order compelling Defendant president and Treasury secretary present to the Court within 7 days a plan to bring Treasury into compliance with 31 U.S.C. § 3101, with that compliance completed within 30 days of the submission to the Court, with that plan subject to review and approval by the Court;

(20)    A temporary restraining order, preliminary, and permanent injunctive relief

enjoining Defendant officers at OMB, Fiscal Bureau, CBO, and CRS from altering any of their current (or past) public information on their respective web sites, web pages, past and current printed public and digitally available information, statements, characterizations, tables, and reports for the status of the Public Debt of the nation, including its limitation (in statute or otherwise), regardless of whatever law on the Public Debt limit, 31 U.S.C. § 3101 is passed by Congress in 2025, including the elimination of the Public Debt limit; Defendants are enjoined from reporting, updating, or categorizing their past reports and what the latest change in law mean until these proposed reports by these Defendant officers are submitted, reviewed, and approved by the Court;

(21)    A temporary restraining order, preliminary, and permanent injunctive relief commanding Defendant officers at OMB, Fiscal Bureau, CBO, and CRS, to meet and fulfill their constitutional and statutory reporting requirement, in view of this long-standing discrepancy between their reports versus the illegality of the "broken" Public Debt limit, Defendants must satisfy the Court that their future reporting complies with five requirements: (1) all past reporting, up to 14:58, Eastern Standard Time, January 8, 2025, shall be preserved in its original form on that date, on their sites, web pages, blogs, characterizations, tables, and reports, *while concurrently identified as incorrect*; (2) a statement by each Defendant officer and agency that the Public Debt limit was adjudicated in Federal Court, that their past reports were found in violation of constitutional and statutory reporting requirements, then explaining why the past reporting shall be preserved; (3) past reporting will be "corrected" as necessary, identifying that reporting which was false for those periods when the Public Debt limit had been "broken," how long it had been "broken" and how great the dollar discrepancy between Treasury borrowings and the still legal and functioning Public Debt limit, of 31 U.S.C. § 3101(b); (4) current and future web pages, blogs, characterizations, tables, and reports by these and subsequent Defendant officers for all matters dealing with the Public Debt limit (regardless of whether the limit is retained or abolished; and on

behalf of their agencies) shall be subject to review and approval by the Court for twenty years; (5) Court ordered reporting requirements in (1), (2), and (3) shall remain in the public record, online and in all printed reports and any other kind of transmission for no less than fifty years;

(22)    Appointment of a Special Master for legal, financial, and securities law issues as soon as possible. *See* Fed. R. Civ. P. 53;

(23)    Appointment of a Special Master for the political, historical, financial, and economic context of federal spending and Debt for the last fifty years, with a special emphasis on the eroding and ultimately corrupted processes in Congress for the passage of the annual appropriation and the ongoing attention by Congress to the Public Debt limit. *See* Fed. R. Civ. P. 53;

(24)    Appointment of a Special Master focused on the First Amendment focused on "professional journalism" over the last fifty years, for its practice, work products, contributions, and major errors in reporting by "professional journalists" and the famous and not-so-famous news organizations, considering the erosion of public trust in the media and the rise of alternative journalism in response to the loss of trust in major media; this special master, using this reporting and analysis prepared for the Court, will consider who-or-what should, could, might be considered a professional journalist and suggest to the Court what "special" privileges and protections "professional journalists" should receive in greater measure than those available *to any citizen-journalist*. *See* Fed. R. Civ. P. 53;

(25)    Appointment of a Special Master to assemble a catalog of all web pages, blogs, characterizations, tables, letters, and reports for all references to the Public Debt limit by OMB, The Fiscal Bureau, CBO, and CRS, publicized, printed, available online, or presented to members, leaders, and committees of Congress, since January 20, 2009; this catalog shall note all documents in their original form at the initial time of presentation, issuance, and availability; this catalog shall note all changes in those documents from their original date of issuance, if prior to August 2, 2011, for all

changes before August 2, 2011; this catalog shall note all changes in those documents, including updates, of pre-August 2, 2011 documents, occurring after that date; this catalog shall note all documents and reports and letters produced by these Defendant officers and their agencies for the period of August 2, 2011, to 14:58 p.m., January 8, 2025, to include all updating and changes of those documents during this time period; this catalog shall note all changes in those documents after 14:58 p.m., January 8, 2025, occurring since that date (documents which may or may not have then been taken down, scrubbed, or removed); this catalog shall include all changes to publicly available web page addresses, for every change to the underlying documentation, every change, addition, deletion, or modification to the list of web addresses used and the documents available for their reports on the Public Debt limit, from January 20, 2009, to the present;

(26) Declarative relief that the 435 receptionist's offices for members of the United States House of Representatives and the 100 receptionist's offices for members of the United States Senate, in the six congressional offices buildings in the Complex, are nonpublic forums of elected public officials where citizens are allowed access to exercise their First Amendment rights, as further protected by the Fourth, Fifth, and Fourteenth Amendments; that citizen access and exercise cannot be arbitrarily controlled or limited by members of Congress, by the Capitol Police Board, its chief and its officers; all requests and manner of access by all citizens must be respected, accommodated, with the least necessary or burdensome conditions imposed by government, which cannot include a demand for an appointment merely for a brief visit to drop off a prayer card, present a letter, leave a citizen-journalist's questions and reporting, a visit to say hello and look around (as a form of assembly), and to petition for a redress of grievances (as often as any citizen petitioner so chooses);

(27) Declarative relief that citizen access to the 435 receptionist's offices for members of the United States House of Representatives and the 100 receptionist's offices for members of the United States Senate on Capitol Hill cannot be materially more restrictive or difficult than the access currently

allowed and routinely available to the district and state offices of these 535 members of Congress;

(28)     Declarative relief that First Amendment rights of each United States citizen, further protected by the Fourth and Fifth Amendments, give all citizens the right of access to all 535 members of Congress, regardless of the residency of that citizen, as these rights, their use, and access receive, have, and are due equal protection under the Fourteenth Amendment;

(29)     Declarative relief that the individual members of Congress, in their official capacity, bear an individual responsibility to ensure, honor, allow, protect, and accept any citizen who presents themselves, who calls, who writes and asks that their First Amendment rights are accommodated so that citizen may interact as they choose, including in-person, with the ability for unscheduled drop in visits with the staff and members of Congress at their district, state, or Capitol Hill offices; it is the responsibility of the individual members of Congress to see that there are no problems with citizen access at their district and state offices, nor any problems of access into and throughout the Complex;

(30)     Declarative relief that the five, separate First Amendment rights of citizens—religion, speech, press, assembly, and petition—have and hold equal standing with one another; have and hold equal weight as rights—individually and in the twenty-six combinations thereof—which must be protected and accommodated by government; government may not favor, allow, or permit more expression, or have a greater tolerance for or begrudging acceptance of one right over any other, nor may it pick one right, subject to less restrictions versus any of the other four rights or the twenty-six combinations thereof;

(31)     Declarative relief that Plaintiff has satisfied the Court that Plaintiff has demonstrated a mastery of the details of and underlying reporting of the spending-and-debt games of Congress and presidents over the last fifty years; Plaintiff's reporting and documentation already before this Court demonstrate a level of professional excellence, competency, honesty, and independence as journalist, reporter, and professional pressman, clearly meeting a standard of a professional reporter whose

status, access, protections, and potential credentialing *must qualify for* and *be recognized as* a "professional reporter" wherever government or others extend by rules, law, regulations, and customary practices preferential access and special treatment for the "enhanced protection of the First Amendment rights accorded to *professional journalists*";

(32)     Enter a temporary restraining order, preliminary, and permanent injunctive relief enjoining the Defendant speaker of the House and the Defendant members of the Senate Rules Committee from their continued violations of Plaintiff's First Amendment press rights, by way of non-response to Plaintiff's July 1, 2024, letter requesting a formal recognition of Plaintiff's status as a "professional congressional reporter" entitled to the ease of access and all other benefits enjoyed by members of the Congressional Press Galleries; the silence by these Defendant congressional officers is a further violation of Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights; Defendant officers shall respond in writing to the Plaintiff and to the Court within 14 days of an order by the Court, on his written request for credentialing and awarding of a Press Photo ID badge-on-a-lanyard;

(33)     Enter a temporary restraining order, preliminary, and permanent injunctive relief enjoining the Defendant speaker of the House and the Defendant members of the Senate Rules Committee from their continued violations of Plaintiff's First Amendment press rights, by way of non-response, to Plaintiff's July 1, 2024, letter requesting a formal recognition of Plaintiff's status as a "professional congressional reporter" entitled to the easy of access and all other benefits enjoyed by members of the Congressional Press Galleries; the silence by these Defendant congressional officers is a further violation of Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights; Court shall command these Defendant officers grant Plaintiff, based upon his letter of application and his demonstrated press professionalism, savvy, and dogged independence, formal and permanent press credential (to renewed by each Congress, subject to good behavior) status and standing, with all of the concurrent benefits accorded to members of the Congressional Press Galleries, responding and conferring this status, in

writing, to the Plaintiff and the Court within 14 days of an order of the Court;

(34)    Enter a temporary restraining order, preliminary, and permanent injunctive relief enjoining all Defendant members of Congress from their continued violations of Plaintiff's First, Fourth, Fifth, and Fourteenth Amendment rights, for their past-and-current violations by their silence in response to his letter to them of July 16, 17, or 18, 2024; Defendant members of Congress must respond in writing to the Plaintiff and to the Court within 14 days, granting Plaintiff their written approval for his drop in visit to their receptionist's office; further, Defendant members of Congress shall inform the Chief of the Capitol Police of their approval for Plaintiff's access into the Complex, under their signature, so that the Capitol Police will honor and accommodate Plaintiff's visits;

(35)    Enter a temporary restraining order, preliminary, and permanent injunctive relief requiring Defendant members of Congress, by letter, commit to the following protections of John Paul Durbin's First Amendment rights, to include Plaintiff's: (A) Free Exercise of Religion, including his right to be in the Complex for the sole purpose of delivering prayerful and religious notes to the receptionists for members of Congress, those written sentiments which commingle the Plaintiff's deeply held religious beliefs with his heartfelt calling to spread a political gospel in the furtherance of honest, transparent, orderly, calm, deliberative, and accountable: public government; (B) Plaintiff's First Amendment Rights of Religion includes an additional 15 combinations with his rights speech, press, assembly, and petition; concurrently informing the Capitol Police;

(36)    Enter a temporary restraining order, preliminary, and permanent injunctive relief requiring Defendant members of Congress, by letter, commit to the following protections of John Paul Durbin's First Amendment rights, to include Plaintiff's: (A) Freedom of Speech, including Plaintiff's rights to be in the Complex for the sole purpose of verbally speaking with congressional staffers and receptionists, without having an appointment, or to bring with him any written speech that he chooses without limitation on the numbers of pages or the number of offices visited during

—— 134 ——

the "open to the public" hours; (B) Plaintiff's First Amendment Rights of Speech includes an additional 15 combinations with his rights of freedom of religion, press, assembly, and petition; concurrently informing the Capitol Police;

(37)    Enter a temporary restraining order, preliminary, and permanent injunctive relief requiring Defendant members of Congress, by letter, commit to the following protections of John Paul Durbin First Amendment rights, to include Plaintiff's Press rights, which acknowledges his rights as a citizen-journalist to: (A) be in the Complex to visit the seven congressional office buildings and the Capitol Building for the sole purpose of reporting on Congress and its members, its actions and policies, on its public deliberations; (B) Plaintiff may visit congressional offices to speak with staffers and receptionists in pursuit of his reporting without having an appointment; (C) Plaintiff may bring with him any written reporting, documents and papers he choose, seeking responses to his written questions, without limitation on the numbers of pages he brings or the number of offices he visits; (D) Plaintiff's First Amendment Press rights includes an additional 15 combinations with his rights religion, speech, assembly, and petition; concurrently informing the Capitol Police;

(38)    Enter a temporary restraining order, preliminary, and permanent injunctive relief requiring Defendant members of Congress, by letter, commit to the following protections of John Paul Durbin's First Amendment rights, to include Plaintiff's: (A) Freedom of Assembly, which protects his rights as a citizen to be in the United States Capitol Hill Office Complex, to visit the seven congressional office buildings (Cannon, Ford, Longworth, Rayburn, Dirksen, Hart, Russell) and the Capitol Building for the sole purpose of wandering the public spaces, hallways and corridors, visiting the receptionist's offices of members of Congress, to be in the moment as a thoughtful citizen-observer without a need or desire to speak with congressional staffers and receptionists or to deliver any written religious pamphlet or tract, written speech or reporting, or petition; (B) Plaintiff may wander, assemble, in these public spaces of these buildings during those hours when these

buildings are "open to the public"; (C) Plaintiff's First Amendment Rights of Assembly includes an additional 15 combination with his rights of religion, speech, press, and petition; concurrently informing the Capitol Police;

(39)    Enter a temporary restraining order, preliminary, and permanent injunctive relief requiring Defendant members of Congress, by letter, commit to the following protections of John Paul Durbin's First Amendment rights, to include Plaintiff's: (A) Right to Petition the Government For a Redress of Grievances, which protects his rights as a citizen to be in the Complex, to visit the seven congressional office buildings and the Capitol Building for the sole purpose of delivering his petition to members of Congress; (B) Plaintiff's right to Petition the Government For a Redress of Grievances may be a document, from a single page to hundreds of pages, personally delivered to as many individual congressional offices as the Plaintiff chooses, for any one day or as many as he chooses, with no appointments necessary for the presentation-delivery by the Plaintiff of his Petition to congressional receptionists; (C) Plaintiff's right to Petition the Government For a Redress of Grievances is an enduring right, not limited to a one-time delivery of a single document, but extends to as many petitions as citizen John Paul Durbin deems necessary and wishes to present to members of Congress; (D) Plaintiff's access to Petition the Government For a Redress of Grievances shall be unrestricted by the number of offices he visits during the "open to the public" hours of the United States Capitol Hill Office Complex; (E) Plaintiff's First Amendment Rights of Petition includes an additional 15 combinations with his rights of freedom of religion, speech, press, and assembly; concurrently informing the Capitol Police;

(40)    That the Court judge, decree, declare, and render a Declaratory Judgment that the refusal by Defendant members of Congress to act upon the written requests of John Paul Durbin for his First Amendment rights, to confirm and validate Plaintiff's rights to engage with members of Congress, to confirm and validate Plaintiff's First Amendment Press rights, including his access to

the seven congressional office buildings of the Complex and the Capitol Building during those hours when each individual building is "open to the public," detailed in this complaint, have been and are unconstitutional on their face and has suppressed all five of John Paul Durbin's First Amendment rights, in violation of the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and federal law;

(41)     That the Court judge, decree, declare, and render a Declaratory Judgment that that (i) a First Amendment press right for professional journalists exists beyond and outside the current arrangements between Congress and the Congressional Press Galleries; (ii) Plaintiff has demonstrated a prima facie case for his status as a professional journalist; (iii) the current practices of Congress for press accreditation are insufficient to accommodate this Plaintiff; (iv) Congress may not, ever, confer accreditation of "other professional journalists" to the existing Congressional Galleries, as that (v) would and does violate due process and equal protection, allowing one "class" of journalists to hold accreditation power over a "different kind of professional journalist," perhaps a citizen-journalist-activist, who would, in fact and by practice, be both a competitor and a journalist whose professional reporting style, viewpoint, journalistic ethics, employment and compensation would be so radically different from theirs; (vi) since the House and Senate, respectfully, do not have an existing process for the accreditation professional journalists who are not Washington-based, and (vii) having failed to respond to the Plaintiff in a timely and forthcoming manner, (viii) the Court finds that the speaker of the House and the Senate Rules and Administration Committee have violated Plaintiff's First Amendment press rights and (ix) must, forthwith, award him a press credential, (x) to include the photo I.D. badge-on-a-lanyard worn by everybody else;

(42)     That the Court judge, decree, declare, and render a Declaratory Judgment that the acts requested by John Paul Durbin, for the exercise of his First Amendment rights in the Complex: (a) to be in the Complex during normal business hours when those buildings are open to the public, (b) to

visit any-and-all 535 congressional receptionist's offices, (c) with no appointment necessary, (d) with no restrictions for the number of documents or their pages, (e) to document his visits—in the public spaces, includes receptionist's offices—by audio, photographic, and videographic recording (including wearing a body camera), (f) shall not, under normal circumstances, be challenged or hindered by congressional staffers or the Capitol Police, as these requests, individually and together: do not violate any provisions of 40 U.S.C. § 5104 (e)(2), including 40 U.S.C. § 5104 (e)(2)(C)(i);

(43)     Declaratory relief that the Board's failure to respond to the July 11, 2024, letter seeking to confirm details for Plaintiff's access to the Complex violates John Paul Durbin's rights under the First, Fourth, Fifth, and Fourteenth Amendments and federal law;

(44)     Declaratory relief that the Board's failure to respond to the July 11, 2024, letter created an undue, unnecessary, and intolerable burden on the Plaintiff, as he attempted to plan for trips to Capitol Hill, violating John Paul Durbin's rights under the First, Fourth, Fifth, and Fourteenth Amendments and federal law;

(45)     Declaratory relief that the Board must respond and lawfully adjudicate and answer all written requests for access by citizens who wish to confirm in advance their access into and throughout the Complex to resolve any questions citizens have based upon the public web pages of the Board for any uncertainties or confusion by the citizen for their specific needs of access;

(46)     Declaratory relief that the public web pages of the Board violate the First, Fourth, Fifth, and Fourteenth Amendment rights of citizens as these pages do not fully or adequately explain the parameters for the constitutionally protected access by citizen to the Complex; the current web pages have too little information; appear to favor one manner of "speech," "drop off a letter," over any other First Amendment rights (to include the 26 combinations of those five, "individual" rights), do not provide for an easy and formal process for citizens to question the information about access on the public web pages nor does the Board provide the offer of and details for adjudication of any

— 138 —

disputes between citizens and the Board over the public policies of the Board, with these failures violations of constitutional and statutory law;

(47)    Declaratory relief that the Plaintiff's First Amendment rights include his ability to visit as many congressional receptionist's offices as he wishes (in any one or more of the seven congressional office buildings: Cannon, Longworth, Rayburn, Dirksen, Hart, Russell, and Ford), for as many days as he chooses, to speak to receptionists, staff, and members of Congress, to bring his written speech and documents (without limitation to the number of pages per copy or the total number of copies), to prayerfully visit each receptionist's office, to engage in his style of "reporting," to "assembly" anywhere in the public spaces of those seven congressional office buildings in the Complex, including receptionist's offices of individual members of Congress, or to deliver his written Petitions to the Government For a Redress of Grievances to receptionist's offices for those hours when each individual building is "open to the public"; Plaintiff First Amendment rights of expression and enjoyment are further protected under the Fourth, Fifth, and Fourteenth Amendments;

(48)    Declaratory relief that the Board must honor Plaintiff's First and Fourth Amendment rights, further protected by the Fifth and Fourteenth Amendments, to mean that the Board must accommodate Plaintiff's First Amendment rights to include his ability to visit as many congressional receptionist's offices as he wishes (Cannon, Longworth, Rayburn, Dirksen, Hart, Russell, and Ford), for as many days as he chooses, speak to receptionists, staff, and members of Congress, bring his written speech and documents (without limitation by page count or total volume), to prayerfully visit receptionist's offices, engage in reporting, assembly anywhere in the public spaces of those seven congressional office buildings in the Complex, including receptionists' offices of individual members of Congress, or to deliver his written Petitions to the Government For a Redress of Grievances to receptionist's offices, for those hours when each individual building is "open to the public";

(49)    Enter a temporary, preliminary, and permanent injunction requiring the Board, its

Chief of Police, all officers of the Capitol Police Department, all other employees, staffers, and agents refrain from any interference with Plaintiff's constitutionally protected access to receptionist's offices in the Complex during those hours when these buildings are "open to the public," that they refrain from any undue or unnecessary screening each time Plaintiff presents himself at any of the buildings in the Complex; they refrain from enforcing any standard upon this Plaintiff which would limit the number of document pages or the total number of pages, to mean that Plaintiff is not subject to publicly stated limit, on the web pages of the Capitol Police, disallowing bags exceeding 18" wide x 14" high x 8.5" deep, nor may the Capitol Police limit this Plaintiff to one bag or box; the Board is required to issue to Plaintiff, by overnight USPS Mail, a letter confirming all details for Plaintiff's access, to include his right to be in the seven office buildings when they are "open to the public," he may bring as many document pages as he wishes, he is permitted to wear a body camera in the public areas, hallways, corridors, elevators, and receptionist's offices in the Complex;

(50)    Enter a temporary, preliminary, and permanent injunction compelling the Board, its Chief of Police, all officers of the Capitol Police Department, all other employees, staffers, and agents to assist Plaintiff, a private citizen, from harassment by the roving packs of credentialed journalists in the Complex, his competitors whose work he has exposed and ridiculed; Plaintiff is not a public figure, not a member of Congress, and, though in public spaces in the Complex, is entitled reasonable accommodations and protections of his personage, escorted by the Capitol Police if so requested by Plaintiff, so the kind of "journalism scrums" which regularly take place in the public spaces of the complex cannot suddenly appear to intimidate, agitate, or otherwise disturb an ordinary citizen, albeit a citizen-journalist who broke the scandal, from his reporting in the Complex;

(51)    That the Court judge, decree, declare, and render a Declaratory Judgment that the refusal by the Board to act upon the written request of John Paul Durbin for his First Amendment rights, to confirm and validate Plaintiff's rights to visit the Complex, to have the parameters of his

— 140 —

visits confirmed in writing so that he might plan his arduous, overnight trips from Ohio to Washington, D.C., and the Board's refusal to grant access as requested detailed in the complaint were and are unconstitutional and those actions suppressed the First Amendment rights of John Paul Durbin, and thereby violated his Fourth, Fifth, and Fourteenth Amendment rights and federal law;

(52)   Court retains jurisdiction of this matter for the purposes of enforcing its orders;

(53)   Award John Paul Durbin nominal, compensatory, and punitive damages;

(54)   Award John Paul Durbin a money judgment for mental pain and anguish, severe and serious emotional distress, for past and present physical toil and harm suffered, including the continuation of these past physical, mental, and emotional challenges and their effects into the future;

(55)   Award John Paul Durbin nominal, compensatory, and punitive damages for all personal security arrangements he deems necessary, for the rest of his life, approved by this Court;

(56)   Award John Paul Durbin reasonable money damages for future use to protect his personal and professional reputations (as they existed before this suit was filed) from any and all animus, attacks, lawsuits, or defamation in reaction to his past reporting (in these documents before this Court and elsewhere), reactions by unknown individuals to this civil action and its subsequent effects in financial markets (upon the savings and investments of most Americans), any necessary public and legal defense of any and all written or verbal statements by Plaintiff as he has categorizing these Defendants or "the media," especially and including current and former members of the Congressional Press Galleries, along with statements and categorizations against these Defendant members of Congress, other members of Congress, this and former presidents, with Plaintiff's need for these public and legal defenses to continue into the future without end; Plaintiff will be portrayed by politicians, those in the media, finance, business and industry as the individual most responsible for whatever changes come to financial markets, to the appropriation process, including any dramatic cuts in annual federal spending and the negative economic

repercussions thereof: all that will be the fault of the Plaintiff in the minds of some, when, in truth, it was the repeated failures by these Defendant members of Congress and others in Congress, current and past administrations, who failed to act over the last 61 months once members and leaders of Congress were put on notice of Plaintiff's reporting and call for the "broken" Public Debt limit to be answered; many of these accused will be more than happy to see one man, Plaintiff, appear as the "bad guy," perhaps a lifelong stigma impossible to outrun;

     (57)    Award John Paul Durbin reasonable costs and attorney's fees pursuant to 28 U.S.C. § 2412 and 42 U.S.C. § 1988;

     (58)    Grant John Paul Durbin such other relief as the Court deems necessary and proper.

### DEMAND FOR JURY TRIAL

     Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: February 5, 2025        Respectfully submitted,

By: _____

JOHN PAUL DURBIN
P.O. Box 66
Walhonding, OH 43843
(571) 250-0112